No. 84-370

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

JOHN HAYES and COLLEEN HAYES,

Plaintiffs and Appellants,

-vs-

CHANNING HARTELIUS,

Defendant and Respondent.

APPEAL FROM:  District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable John M. McCarvel, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Charles M. Cruikshank, III, Great Falls, Montana

For Respondent:

Gregory O. Morgan, Bozeman, Montana

Submitted on Briefs:  Jan. 24, 1985

Decided:  April 9, 1985

Filed: APR 9 1985

_____
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Plaintiff appeals from a judgment of the District Court, Eighth Judicial District, Cascade County. In that judgment the court found as follows: (1) Plaintiffs breached a contract with defendant for the purchase of real property and consequently may not recover partial payment made pursuant to the contract. (2) Plaintiffs cannot recover money from defendant on the basis of unjust enrichment or on the basis that Hartelius holds money for plaintiffs as a constructive trustee. (3) Section 70-25-101(4), MCA of the Montana Security Deposit Act does not apply to this case.

Plaintiffs and defendant were good friends. Channing Hartelius represented John and Colleen Hayes, as their attorney on several occasions, and socialized with John Hayes on numerous other occasions. In 1978 Hartelius had his house up for sale and plaintiffs expressed an interest in buying it. The price of the house was $59,900. Hartelius suggested an arrangement whereby plaintiffs would pay $10,000 down, assume a trust deed balance of $48,310.08 due First Federal Savings and Loan of Great Falls, and sign a promissory note for $1,589.92. Plaintiffs agreed to this arrangement but because of their poor credit rating, First Federal refused to allow them to assume the loan. Despite this obstacle plaintiffs remained eager to buy the house and defendant was willing to find a way to sell it to them. Plaintiffs assured defendant that within one or two years they would be able to secure financing to assume the balance on the loan to First Federal. Consequently, the parties worked out an agreement whereby defendant would remain liable on the trust indenture and make the payments thereon, while plaintiffs would make

2

equal payments to defendant as the trust indenture payments became due. To memorialize this arrangement the defendant prepared a lease and assignment agreement. The agreement was for two years subject to renewal at the mutual agreement of the parties, and provided that once a year plaintiffs would seek approval to assume the loan or would seek refinancing at another institution. Plaintiffs refused to sign the agreement because they had expected a contract for deed, which defendant could not provide because of an acceleration clause in the trust indenture with First Federal. But despite there being nothing in writing between the parties, plaintiffs moved into the house on August 15, 1978 and on August 27, 1978 paid defendant $10,000 down and agreed to pay on the promissory note. Thereafter, plaintiffs made monthly payments of $475 to defendant, who applied the payments to the trust indenture. In addition, plaintiffs paid on the $1,589.92 note in $50.89 monthly installments. From August 1978 to April 1982 plaintiffs occupied the house, insured it in their name, claimed the interest on the bank loan as a tax deduction, and operated a beauty shop on the premises. In October and November of 1979, the monthly payments were returned by the bank for non-sufficient funds (NSF). Defendant sent a letter to plaintiffs imploring them to make the payments good and on time. Plaintiffs did so for several months thereafter, but from May through August of 1980, they paid only $250. On August 4, 1980, defendant sent plaintiffs a notice of default on both the note and the lease agreement. Plaintiffs acknowledged the debt and made payment of $2,166.56, which defendant accepted. Shortly thereafter however, checks for September and November 1980 and February and March 1981, were returned NSF. No payment was made in

3

December of 1980 or January of 1981. On June 29, 1981, the bank gave notice of default to defendant on the May and June payments and assessed late charges of $253.87. After the August, 1981 payment was not made, defendant notified plaintiffs that he was $2,229 past due on the debt and the bank had accelerated. Plaintiffs were given the opportunity to continue occupancy on a rental agreement of $550 per month if payment was brought current. They were advised that they would have to pay or move by October 15, 1981. On October 26, 1981, plaintiffs sent a partial payment and requested a lease agreement. On November 11, 1981, they began to make rental payments of $550 a month. A lease agreement was sent to plaintiffs but was never returned signed. In February, 1982, plaintiffs missed their rent payment and were sent a notice of termination of tenancy. In April of 1982 plaintiffs vacated leaving the house in considerable disrepair. To the end, even after plaintiffs hired an attorney in contemplation of this lawsuit, defendant remained willing to sell the house if plaintiffs could secure financing to take him out of the loan to First Federal. Plaintiffs could not secure financing, however, and brought this action to recover their down payment.

The following issues are presented:

(1) Whether the plaintiffs entered into a contract with defendant for the sale of defendant's house?

(2) Whether the statute of frauds prevents that contract, if if exists, from being enforced?

(3) Whether an unsatisfied condition precedent prevented a lease agreement from becoming a sales agreement?

(4) Whether the Montana Residential Landlord and Tenant Act of 1977, sections 70-24-101, et seq., or 70-25-101, et

4

seq., relating to the residential tenants' securtiy deposits, apply to this case?

This case demonstrates once again that it is not wise for friends to engage in a business deal. If the deal goes sour, so, often, does the friendship. Hartelius had a house to sell and plaintiffs wanted to buy it. The problem was that plaintiffs had such a bad credit rating that they could neither assume Hartelius' loan nor otherwise get financing. Consequently, Hartelius made plaintiffs an offer that amounted, if accepted, to an indirect assumption of the loan. Hartelius would continue to pay the bank if plaintiffs would pay Hartelius. This was an offer only a friend would make, since Hartelius remained liable on the loan if plaintiffs should fail to pay. The plaintiffs fairly jumped to accept the offer. They moved into the house, made a downpayment of $10,000, and agreed to pay on a promissory note, all before any part of the agreement was reduced to writing. When Hartelius drew up a lease and assignment, plaintiffs refused to sign it because it was not a contract for deed. They continued to occupy the house, however, and made good and timely payments in accordance with the agreement for over a year.

There is no question but that the parties made a contract for the purchase of the Hartelius home. They made an oral agreement which was further consented to by conduct. According to section 28-2-501(1), MCA, consent is communicated "by some act or omission of the party contracting by which he intends to communicate it or which necessarily tends to such communication." Further, section 28-2-503(1), MCA, states that if a party performs the conditions of a proposal or accepts the consideration offered

5

with a proposal, then that party has accepted the proposal. In addition, section 28-2-503(2), MCA states that a person who voluntarily accepts the benefits of a transaction, consents to the obligations arising from it, assuming he knows, or ought to know, the facts pertaining to the transaction. Without doubt, plaintiffs communicated their consent to defendant's proposal by moving into the house, making a downpayment, and thereafter making monthly payments. They performed the conditions of the proposal by making the payments, and they accepted the consideration offered by moving into the house. Since they accepted the benefits of the transaction, they also consented to its obligations.

It needs to be emphasized that plaintiffs did not consent, by their conduct, to the terms of the lease agreement drawn up by Hartelius. The evidence shows that plaintiffs refused to sign the lease agreement and made that refusal plain to the defendant. Further, the evidence shows that defendant knew that the plaintiffs thought that the oral agreement of August 1978, pursuant to which plaintiffs moved into the house and paid $10,000 down, was a contract for deed. By their refusal to sign, plaintiffs made clear that they would accept a contract for deed, but not a lease. By accepting payments, by not objecting to the plaintiffs' continued occupation of the house, and by not attempting to revoke or rescind when plaintiffs refused to sign the lease, defendant Hartelius consented to the plaintiffs' interpretation of the oral agreement: that it was a contract for deed.

Section 28-2-102, MCA states the four elements essential to the existence of a contract. In this case there is no question that there are identifiable parties capable of

6

contracting, that there is a lawful object and that there is consideration. The only question is whether or not there was consent. The facts clearly indicate an offer, an acceptance, and mutual consent to the sale of defendant's house. We hold, therefore, that the parties entered into a contract for the sale of real property.

Plaintiffs argue that, even if there were a valid contract between the parties, it is unenforceable due to the statute of frauds. The statute of frauds is codified in sections 28-2-903 and 70-20-101, MCA. Section 28-2-903(1)(d) states that "an agreement for the leasing for a longer period than 1 year or for the sale of real property" is invalid if not in writing and subscribed to by the party to be charged. Section 70-20-101, MCA states that real property cannot be transferred unless there is a writing signed by the transferor. Taken alone, these statutes would render this contract unenforceable since no writing was signed by either party.

There are two reasons, however, why the statute of frauds does not apply to this case. First, the parties admitted the existence of a contract. This Court has taken the position on several occasions that it will not allow the statute of frauds, the object of which is to prevent fraud, to be used to accomplish fraudulent purposes. Ryckman v. Wildwood, Inc. (1982), 197 Mont. 154, 641 P.2d 467; Hillstrom v. Gosnay (Mont. 1980), 614 P.2d 466, 37 St.Rep. 1087; Farmers Elevator Co. of Reserve v. Anderson (1976), 170 Mont. 175, 552 P.2d 63. In this case, it would be a fraud on the defendant to allow plaintiffs to admit to the contract, and then allow them to avoid its obligations by asserting the statute of frauds. We refuse to countenance such a result.

7

Second, defendant Hartelius has performed on the contract to his detriment. The principle of part performance as an exception to the statute of frauds is recognized in sections 70-20-102 and 30-11-111, MCA. The same principle has long been recognized by this Court. See Dyksterhouse v. Doornbos (1977), 172 Mont. 461, 564 P.2d 1293; Epletviet v. Solberg (1946), 119 Mont. 45, 169 P.2d 722; Cobban v. Hecklew (1902), 27 Mont. 245, 70 P. 805. In Epletviet we held that where one party to an oral contract has performed in reliance thereon, it would be a fraud to allow the other party to set up the statute of frauds as a justification for repudiating the contract. "[E]quity will regard [such a] case as being removed from the operation of the statute and will enforce the contract by decreeing specific performance of it, or by granting other appropriate relief." Epletviet, 119 Mont. at 57, 169 P.2d at 729. In the present case, defendant withheld his property from the market for four years, relinquished possession of it for four years, and permitted plaintiffs to claim a tax deduction on the interest payments to First Federal. He did these things to his detriment and in reliance on the contract. After such part performance, to allow the statute of frauds to defeat the contract would itself be fraud on Hartelius. We will not permit the statute of frauds to be so used.

The plaintiffs contend that an unsatisfied condition precedent in the lease agreement prevents the lease agreement from becoming a sales agreement. As previously noted, we find no lease agreement in this case. Defendant wrote up a lease and assignment agreement but plaintiffs refused to sign it because it was not a contract for deed. Defendant did not insist that plaintiffs sign the lease agreement. Instead, he

8

acquiesced to the oral purchase agreement. Since there was not consent to the lease agreement, its terms do not determine the existence of the sales contract. The sales contract was formed without relation to the proposed lease agreement. Therefore, whether or not there is an unsatisfied condition precedent in that document is of no relevance to the disposition of this case. Additionally, since we find that the parties did not enter into a lease, neither the Montana Landlord Tenant Act, nor Montana statutes relating to tenants' security deposits, apply to this case.

In conclusion, we find that plaintiffs and defendant entered into an oral contract for the sale of real property. The statute of frauds does not render this contract invalid. Plaintiffs breached the contract by not making timely and sufficient payments. Defendant did not obtain any money from plaintiffs by wrongful means. As the District Court noted, defendant demonstrated the soul of patience and practiced considerable restraint. Therefore, there is no equitable basis by which plaintiffs can recover partial payment made under the contract. In addition, it is the rule in Montana that a purchaser, under an oral agreement for the sale of real estate, cannot recover partial payments on the purchase price if the seller remains willing and able to carry through with the agreement. Perkins v. Allnut (1913), 47 Mont. 13, 130 P.2d 1. Defendant has at all times been willing and able to perform on the contract. He should not be forced to disgorge the payments made thereon.

We affirm the judgment of the District Court.

Justice

9

We concur:

_____

John E. Sheehy

_____

_____

Justices

10